UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

TIMOTHY T. WILSON,

    Plaintiff,

v.

WEXFORD HEALTH INC.,
CORIZON MEDICAL COMPANY,
DR. PAUL MATERA,
DR. ORIAKU IJOMA,
NURSE TRACY,
SGT. JACKSON,
DR. SONJA WILSON, and
NURSE CHICA,[1]

    Defendants.

Civil Action No. TDC-19-1126

## MEMORANDUM OPINION

Plaintiff Timothy T. Wilson, an inmate confined at the Maryland Correctional Institution-Jessup ("MCI-J") in Jessup, Maryland, has filed a civil action against Defendants Wexford Health Inc. ("Wexford"), Corizon Health, Inc. ("Corizon"), Dr. Paul Matera, Nurse Practitioner Oriaku Ijoma, Nurse Tracey Hall, Sgt. Jackson, Dr. Sonja Wilson, and Nurse Chika Ezenwachi, alleging denial of adequate medical care. Wilson alleges that during his incarceration at the Eastern Correctional Institution ("ECI") in Westover, Maryland and Central Maryland Correctional Facility ("CMCF") in Sykesville, Maryland, he received inadequate medical care for a wound and that his referral to an outside specialist and surgery on the wound were improperly delayed.

---

[1] The Clerk shall amend the docket to reflect the correct names of Defendants Wexford Health Sources, Inc., Corizon Health, Inc., Oriaku Ijoma, N.P., Chika Ezenwachi, R.N., and Tracey Hall, R.N. Sgt. Jackson has not been served with the Complaint, and the Complaint against him is dismissed without prejudice.

Pending before the Court are a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("the Wexford Motion") filed by Defendants Wexford, Matera, Ijoma, and Hall (collectively, the "Wexford Defendants") and a separate Motion to Dismiss or Alternatively for Summary Judgment ("the Corizon Motion") filed by Defendants Corizon, Wilson, and Ezenwachi (collectively, "the Corizon Defendants"), which are fully briefed. Upon review of the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motions will be GRANTED.

## BACKGROUND

In 2001, Wilson sustained a gunshot wound which resulted in pancreatic injury and chest surgery. In 2005, he received a stab wound which resulted in another chest surgery. Wilson also suffers from chronic hemoptysis, empyema, allergic rhinitis, spleen injury, and diabetes mellitus. Prior to December 31, 2018, while Wilson was incarcerated at ECI, Wexford had the contract to provide medical care to Maryland state prisoners. As of January 1, 2019, Corizon became the contract medical care provider and was responsible for providing care to Wilson during 2019 while he was incarcerated at both ECI and CMCF.

### I.  Wexford Care

On August 6, 2018, while Wilson was incarcerated at ECI, a spot along Wilson's surgical scar from 2005 opened up on the right side of his chest. He received antibiotics, and the wound closed, but about two weeks later it reopened. On August 17, 2018, during a visit to Nurse Erica McKnight for insulin administration, Wilson showed the nurse the wound area, which had pustules and other fluid-filled sacs and had drainage coming from it. He reported that a piece of hardware in his back from the surgery was starting to come out. The nurse prescribed the antibiotic Bactrim.

Two days later, on a return visit, there was increased redness and a white discharge coming from the wound. Wilson was provided Tylenol to manage his pain.

On August 30, 2018, Dr. Matera examined the wound area and did not see discharge at that time. He could not tell whether a foreign body, such as a suture, was present. He ordered a chest x-ray and ordered wound checks to continue. On August 31, 2018, laboratory results were received showing that Wilson tested positive for a bacterial infection in the wound area involving Methicillin Resistant Staphylococcus Aureus ("MRSA"). He was prescribed the antibiotic Tetracycline 500 mg to treat the infection to be taken twice a day.

Wilson was seen by McKnight for wound care on September 10, 2018 and reported that the wound was not draining as much and did not report pain. However, on October 27, 2018, he reported during a wound care visit that the wound had reopened for the third time and was painful. On October 30, 2018, on another visit for wound care, Wilson reported increased pain and that the wound was draining. A nurse practitioner gave him Motrin for the pain. According to Wilson, on an unspecified date in this time frame he submitted a written request to be taken to the University of Maryland Hospital, where the original surgery was performed.

On November 2, 2018, Wilson was seen by Ijoma, a nurse practitioner. Where the wound was still not healed, Ijoma prescribed the antibiotic Doxycycline and referred him for a consultation with a doctor. Ijoma reviewed Wilson's A1C level from August 2018, which was 12.1, and told him that he would not be considered for surgery unless his A1C level was 8.0 or below. The A1C is a blood test given to diabetics to show blood glucose levels. A 12.1 is a dangerously high glucose level, and an individual with a level higher than 8.0 has chronic hyperglycemia and is at risk for poor surgical outcomes, including longer lengths of stay and higher rates of morbidity. Ijoma ordered an updated A1C test for Wilson.

On November 18, 2018, Wilson filed a sick call slip, complaining that the wound had reopened, was draining pus, and his pain had increased. Dr. Matera evaluated Wilson on November 20, 2018. He observed that the wound remained unhealed and concluded that there was a foreign object in that area. At that point, as reflected in tests ordered by Ijoma, Wilson's A1C level had declined from 12.1 in August 2018 to 9.0 in November 2018. Dr. Matera submitted a request that Wilson receive a general surgery evaluation, thoracic surgery evaluation, or CT scan. According to Wilson, Dr. Matera told him that after the consultation, he would be sent to the University of Maryland Medical Center for surgery because "this problem will continue to happen." Compl. at 3, ECF No. 1.

On November 24, 2018, Wilson received additional wound care from McKnight. On December 2, 2018, Wilson submitted a sick call slip complaining of pain on the right side of his chest and stating that the wound was draining pus and smelled bad. He was seen for wound cleaning and dressing by McKnight on December 4 and by Hall on December 7. He continued to receive Motrin for pain relief.

On December 12, 2018, Bruce Ford, a physician's assistant, advised Wilson that his surgical consultation or CT scan consultation had been approved. According to Wilson, he was supposed to go to an outside hospital for a consultation on December 13, but he was told that somehow it was his doctor's fault that he was not sent there. He was told on December 19 that he would not be sent anywhere until after the holidays.

Wilson received wound care and dressings on December 16, 2018, December 19, 2018, and December 20, 2018. There continued to be yellowish discharge from the wound. According to Wilson, during the December 20, 2018 visit, Hall told him that the explanation for not sending him to an outside hospital was "a bunch of bullshit" and that because Wexford was ending its

contract as the prison system's healthcare provider, "they are prolonging your surgery so that they would not have to pay to have the surgery done." Opp'n Wexford Mot. at 6-7, ECF No. 25. Although Wexford has not submitted any statement from Hall to dispute this account, Dr. Jason Clem of Wexford has asserted that it would normally take 4-8 weeks to arrange for an inmate to receive an appointment for, and to be transported to, an off-site evaluation. Dr. Clem denies that Wexford had a policy of delaying inmate medical care for cost purposes.

The last medical care that Wexford personnel provided to Wilson was a December 27, 2018 order that he receive Tylenol 325. At the end of 2018, Wexford's contract to provide medical care to inmates ended.

## II.   Corizon Care

On January 1, 2019, Corizon took over as the contract medical care provider for the Maryland prison system. On January 23, 2019, Wilson was taken to Jessup Correctional Institution ("JCI"), from which he would be taken to Bon Secours Hospital in Baltimore, Maryland for a surgical consultation on his chest wound. According to Wilson, Sgt. Jackson, a correctional officer at JCI, told him that he was too late to go to the hospital from there because his appointment was that day, and that he should have come to JCI the day before. Wilson was then returned to ECI on January 25, 2019 without having had the surgical consultation. Upon his return, Wilson recounted to Hall that ECI had sent him to JCI too late for his appointment. Hall advised Wilson that Sgt. Jackson was wrong and that his appointment was for January 24, such that he was, in fact, sent to JCI the day before. Sometime in January 2019, Dr. Matera spoke to Dr. Hanna, a general surgeon at Bon Secours Hospital, who recommended that a cardiothoracic surgeon evaluate Wilson.

Between January 25 and February 19, 2019, Wilson received wound care from nurses on six occasions. On February 19, 2019, during a chronic care visit, a physician's assistant observed

that Wilson had an open wound, approximately 0.5 centimeters in diameter, with a thick, yellowish discharge and a foul odor. A consultation with a cardiothoracic surgeon was requested.

On or about February 28, 2019, Wilson was transferred from ECI to CMCF. On March 19, 2019, Wilson was examined by Dr. Sonja Wilson of CMCF for the first time. According to Wilson, Dr. Wilson told him that based on his electronic medical records, he had already had surgery in January 2019. Wilson told her that he had not received surgery and explained that he was supposed to see a specialist on January 24, 2019 but was unable to see anyone. During that visit, Dr. Wilson observed on Wilson's torso a small open area with drainage within one of the surgical scars. Dr. Wilson noted that a request for a consultation with a cardiothoracic surgeon had been made and that she would follow up regarding its approval. Dr. Wilson ordered daily wound care, testing including a wound culture, and a follow-up appointment in 30 days. She also discontinued Wilson's prescription for Mobic, because he reported that it was ineffective, and prescribed Naprosyn for pain relief. Noting that Wilson's A1C level was 9.0 and his blood sugar level was elevated, Dr. Wilson ordered follow-up testing. A test on March 27, 2019 revealed that Wilson's A1C level was 11.3 and his glucose level was high.

On March 27, 2019, Nurse Ezenwachi collected a sample from Wilson's wound for a wound culture, but the test could not be performed because the sample was collected using incompatible supplies. At the time, Ezenwachi was not aware of the incompatibility. On April 3, 2019, Dr. Wilson re-ordered the wound culture.

Wilson was again seen by Dr. Wilson on April 8, 2019. Although Dr. Wilson noted that Wilson was to receive a CT scan of his chest and a consultation with the cardiothoracic surgeon, she advised Wilson that his blood sugar was too high for surgery. She advised Wilson to comply with his diet and medications and directed him to return to the clinic in 15 days for a wound check.

When Wilson reported that Naprosyn and Mobic had not addressed his chest wall pain, Dr. Wilson prescribed Robaxin, a muscle relaxer, for pain relief. At Dr. Wilson's direction, Ezenwachi collected a sample from Wilson's wound for the wound culture.

On April 15, 2019, Dr. Wilson reviewed the results of Wilson's wound culture, which was positive for MRSA. Dr. Wilson prescribed Clindamycin to address this infection. She saw Wilson for a follow-up visit on April 24, 2019, due to complaints of right arm pain. At that time, the Clindamycin had reduced the amount of drainage from his wound. Several days later, Wilson was sent for a CT scan. According to Wilson, when he later asked Ezenwachi about the results of the CT scan and wound culture, she told him to submit a sick call slip, but she did not follow up with him after he did so.

On May 17, 2019, Wilson was evaluated by Dr. Whitney Burrows, a thoracic surgeon of the University of Maryland School of Medicine. Dr. Burrows reviewed Wilson's CT scan, which showed two retained metallic fragments. She recommended a repeat CT scan at the University of Maryland Medical Center with a marker in order to better localize the wound. Since the wound did not show any chest wall or rib involvement, Dr. Burrows referred Wilson to a plastic surgeon, Dr. Arthur Nan.

On May 28, 2019, Wilson had a follow-up visit with Dr. Wilson, who renewed his Clindamycin antibiotic prescription for the MRSA and Motrin for pain. Based on Dr. Burrows's recommendation, Dr. Wilson submitted a request for a CT scan without contrast. That CT scan occurred on June 13, 2019 and showed a ballistic fragment and tiny metallic items in Wilson's chest. On June 20, 2019, Dr. Wilson submitted a request for a plastic surgery consultation. On July 5, 2019, Dr. Wilson saw Wilson again, re-ordered the antibiotic Clindamycin, the pain

medications Motrin and Robaxin, and a repeat wound culture. She again advised Wilson to comply with his diabetic diet and medications so that he would be medically stable for surgery.

On July 19, 2019, Dr. Evan Bryan Buckingham, a plastic surgeon, examined Wilson. With Wilson's consent, Dr. Buckingham performed a bedside incision and drainage, revealing an intact permanent suture at the base of Wilson's sinus tract which was believed to be the source of the chronic wound. Dr. Buckingham directed Wilson to return to the clinic in three to four weeks and expressed the belief that there were other items that needed to be removed.

Wilson had another follow-up appointment with Dr. Wilson on July 22, 2019, at which she discontinued the Robaxin prescription and prescribed Baclofen for pain management. As of mid-August 2019, Wilson was still experiencing blood and pus draining from the wound. On August 19, 2019, Dr. Wilson advised him that she had submitted a request for another consultation with the plastic surgeon. Although Wilson was scheduled for a follow-up visit with the plastic surgeon on or about August 21, 2019, he finally received surgery by Dr. Buckingham to remove the sutures or other metal objects inside his chest on September 25, 2019. Since that time the wound had not reopened.

## DISCUSSION

In their Motions, Defendants seek dismissal under Federal Rules of Civil Procedure 12(b)(6) or summary judgment under Rule 56. Specifically, Defendants argue that (1) Wilson has not alleged sufficient facts to state a plausible claim for relief against Wexford or Corizon as he has failed to identify any custom or policy of deliberate indifference to serious medical needs; and (2) the record evidence establishes that Defendants did not violate Wilson's constitutional rights because they were not deliberately indifferent to the need to provide medical care and surgery on his chronic wound.

8

## I. Legal Standards

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers only the complaint and any attached documents "integral to the complaint." *Sec'y of State for Def. v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007). Courts must treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed. R. Civ. P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* "Reasonable opportunity" has two requirements: (1) the nonmoving party must have some indication that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment; and (2) the nonmoving party must be afforded "a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985). Here, the notice requirement has been satisfied by the title of Defendants' Motions. To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d) explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56(d); *see Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244–45 (4th Cir. 2002). Wilson has not asserted that he needs additional discovery in order to address the Motions. The Court therefore will construe Defendants' Motions as motions for summary judgment.

Under Federal Rule of Civil Procedure 56, the Court grants summary judgment if the moving party demonstrates that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In assessing the Motion, the Court views the facts in the light

most favorable to the nonmoving party, "with all justifiable inferences" drawn in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.*

## II. New Allegations

In his briefs on the Motions, Wilson references other incidents not addressed in the Complaint. For example, he references a 2013 episode in which he sought surgery to address the same or a similar issue and notes that the issue was addressed in a different federal case that was ultimately dismissed. To the extent that these facts are offered as relevant to the present allegations of inadequate medical care on his chronic chest wound from August 2018 forward, they will be considered. To the extent that they could be construed as new allegations, briefs in opposition to a dispositive motion may not be used to amend a complaint or add new claims. *See Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998); *Mylan Laboratories, Inc. v. Akzo, N. V.*, 770 F. Supp. 1053, 1068 (D. Md. 1991), *aff'd*, 2 F.3d 56 (4th Cir. 1993). Accordingly, the Court will not consider any new causes of actions asserted in the briefs.

## III. Eighth Amendment

Wilson asserts that Defendants violated his rights under the Eighth Amendment to the United States Constitution by providing inadequate medical care relating to his chronic chest

10

wound. The Eighth Amendment, which protects prisoners from "cruel and unusual punishment," prohibits "unnecessary and wanton infliction of pain" against inmates. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). In order to state an Eighth Amendment claim arising from inadequate medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle*, 429 U.S. at 106. Such deliberate indifference requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). As for the subjective component, "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively knows of and disregards an excessive risk to inmate health or safety." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178 (citations omitted). "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Id.* Thus, "[d]eliberate indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto*, 841 F.3d at 225 (internal

alterations omitted). Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Moreover, if the requisite subjective knowledge is established, an official may avoid liability if the official "responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Wilson has expressed understandable frustration at the length of time it took to have his open, infected wound addressed through surgery. From the time that he reported that the wound had reopened in August 2018 until he received surgery in September 2019 to remove the metal objects and apparently close the wound permanently, Wilson endured over a year of a draining wound, infection, and pain. The Court agrees that such a lengthy time period is too long and is not acceptable. Where Corizon has recently taken over the contract to provide medical care for Maryland state inmates, the Court puts that company on notice that going forward, such delays will be viewed with great concern. Had a single company or a single medical team been responsible for Wilson's medical care during this one-year period, there would be a significant likelihood that constitutional violations would have been found.

Here, however, Wilson, through no fault of his own, was subject to care from two different companies during this time period: Wexford from August 2018 to December 2018, and Corizon from January 2019 until the Complaint was filed in April 2019 and the surgery occurred in September 2019. Wilson also was subject to care from two different medical teams at two different prisons: ECI from August 2018 to February 2019, and CMCF from March 2019 forward. Thus, on this Motion, the Court must consider the specific question whether any Defendant, individual or entity, violated the Eighth Amendment by engaging in deliberate indifference to Wilson's

undisputedly serious medical need. Upon review of the record, the Court finds that it does not support such a finding.

### A. Wexford Defendants

#### 1. Matera, Ijoma, and Hall

The record reflects that the medical care from August 2018, when Wilson first reported the open wound, until December 2018, was adequate and that the medical personnel did not act with deliberate indifference to Wilson's needs. After Wilson notified a nurse of the open wound, he received antibiotics and pain relievers. Dr. Matera examined the wound on August 30, 2018 and ordered a chest x-ray and regular wound checks. As a result, Wilson received regular wound care over the next several months. After apparent improvement, Wilson reported that the wound had reopened again on October 27, 2018. When Ijoma saw Wilson on November 2, 2018, and observed that the wound had still not healed, she prescribed an antibiotic and referred Wilson for a consultation with a physician. She also reviewed Wilson's A1C level and advised him that he could not have surgery until that reading declined. When Dr. Matera saw Wilson again on November 20, 2018, Dr. Matera ordered a CT scan and an outside surgical evaluation. That request was approved before December 12, 2018. In January 2019, around the time that Wilson was sent out for a surgical consultation but was unable to actually get to the hospital, Dr. Matera spoke to a general surgeon at Bon Secours Hospital, who recommended that Wilson be seen by a thoracic surgeon.

Based on this record, the Court finds that the evidence does not support a finding of deliberate indifference by Dr. Matera or Ijoma. Both observed Wilson's wound and rather than ignore it, took steps designed to advance the evaluation and treatment of the wound. Although the gap between Dr. Matera's two examinations was multiple months, and there is no clear evidence

on when the chest x-ray was completed, where the wound care ordered by Dr. Matera proceeded regularly and no surgery would have been possible during 2018 and early 2019 because of Wilson's blood sugar levels, such a time lag between examinations does not support a finding of deliberate indifference to Wilson's medical needs. Notably, when Wilson reported on October 27, 2018 that the wound had reopened, within a week he was seen by Ijoma, and then by Dr. Matera two weeks later. Although Wilson raises questions about the delay following Dr. Matera's request for a surgical evaluation, there is no claim or facts establishing that either Ijoma or Dr. Matera was responsible for any such delay.

Moreover, there is no evidence that Hall acted with deliberate indifference. The allegations relating to Hall are that while providing wound care, she told Wilson that the delay in scheduling his surgical consultation was based on a Wexford decision to delay it until after its contract ended on December 31, 2018, and that once that appointment was scheduled but missed, she clarified for him that his appointment was, in fact, the day after Wilson was sent to JCI in preparation for that appointment. These allegations show that if anything, Hall was seeking to assist Wilson by providing information and in no way show that she acted with deliberate indifference to his medical needs. Accordingly, the Motion will be granted as to Dr. Matera, Ijoma, and Hall.

### 2. Wexford

Wexford and Corizon are private corporations that, at the time of the events in question, had contracts to provide health care to Maryland state prisoners. Entities such as Wexford and Corizon may be held liable under § 1983 only to the extent that they have a custom or policy that causes a violation of the Constitution or laws of the United States, such as a policy of deliberate indifference to serious medical needs. *See Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28

(4th Cir. 1999); *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978).

Here, the Complaint alleges that Hall told Wilson that Wexford was delaying his surgical consultation until after December 31, 2018, when Wexford's contract was to expire, as a cost savings measure. Although Wexford has offered the declaration of Dr. Clem, who denied that Wexford had a policy to delay medical procedures to save costs at the end of its contract, it notably has offered no declaration from Hall denying the statements attributed to her. Nevertheless, regardless of whether the statement was made, the record reflects that Dr. Matera's request for a surgical consultation was made on November 20, 2018 and approved sometime before December 12, 2018. He was then scheduled for a surgical consultation at Bon Secours Hospital on January 24, 2019. Based on Dr. Clem's statement, it typically takes 4-8 weeks to have a prisoner scheduled for and transported to an outside surgical consultation. There is no evidence to dispute this timeline. Thus, under these facts, there was no unusual or improper delay in the scheduling of Wilson's surgical consultation.

Moreover, the fact that Wilson was not able to see the surgeon on January 24, 2019 is not fairly attributable to Wexford, which was no longer the contract medical provider. Even assuming that Hall was correct that Wilson was sent to JCI the day before the appointment as required, there is no evidence that Sgt. Jackson, a correctional officer at JCI who had no prior dealings with Jackson and no affiliation with either Wexford or Corizon, deliberately prevented Wilson from being sent to the hospital or that this unfortunate episode was anything other than a mix-up. The record thus does not support a finding of deliberate indifference against Wexford.

### B. Corizon Defendants

The record also does not support a finding of deliberate indifference by the Corizon Defendants. Significantly, Dr. Wilson had no involvement in Wilson's treatment until March 2019, after Wilson was transferred from ECI to CMCF, where Dr. Wilson provides medical care. Dr. Wilson saw Wilson for the first time on March 19, 2019, less than three weeks after his transfer, and ordered wound care, a wound culture, testing on his blood sugar levels, and pain medication. She also followed up on the request for a surgical consultation and a CT scan. Dr. Wilson saw Wilson again on April 8, 2019 and April 15, 2019. Before the end of April 2019, Wilson had a CT scan, and the first surgical consultation occurred on May 17, 2019. Even after the Complaint in this case was filed on April 16, 2019, Dr. Wilson continued to provide regular medical treatment in the form of antibiotics, pain medication, and a request for a plastic surgeon. This record does not support a finding of deliberate indifference on the part of Dr. Wilson. Indeed, Wilson acknowledges that the reason he included Dr. Wilson as a Defendant was that at his first visit she stated that his medical records showed that he had surgery in January 2019, likely a reference to records relating to the failed surgical consultation on January 24, 2019. However, when Wilson told her he never had surgery, she did not dispute his account and made the appropriate requests for surgical consultations going forward. Accordingly, the Motion will be granted as Dr. Wilson.

As for Nurse Ezenwachi, the only allegations against her are that she used the wrong supplies in taking a wound culture sample on March 27, 2019. Ezenwachi has acknowledged that she made a mistake, and a new sample was taken within the next few weeks. There is no evidence that she deliberately conducted the test in a flawed manner. Finally, Wilson's claim that she did not follow up on a request that she inform him of the results of the CT scan and wound culture,

even if true, does not support an inference of deliberate indifference. The Motion will be granted as to Ezenwachi.

As for Corizon, Wilson has not alleged that Corizon had a custom or policy to deliberately delay medical treatment. Unlike Wexford, there was no financial incentive for Corizon to delay treatment past a certain date. Further, the record, which is limited to the treatment of Wilson only, does not include facts sufficient to support a finding of a policy of deliberate indifference. The Motion will therefore be granted as to Corizon. *See Austin*, 195 F.3d at 727-28.

More broadly, the Court notes that the record does not support a finding of deliberate indifference by other medical personnel during Corizon's tenure. Rather, it reflects that once Wilson was transferred to CMCF, the medical team gave regular attention to Wilson's chronic wound, including wound care, antibiotics, pain medication, and testing of his blood sugar, which needed to be lowered before he could have surgery, as well as requests for diagnostic tests and surgical consultations. To the extent that Wilson may disagree with decisions to order certain test and consultations, and to refrain from surgery while Wilson's blood sugar level remained high, such disagreements do not support a finding of deliberate indifference. *See Scinto*, 841 F.3d at 225

In finding no Eighth Amendment violations, the Court does not minimize the hardship that Wilson has endured. The record reflects an unfortunate series of events that combined to delay his eventual surgical procedure. After Corizon took over as the contract medical provider, the initial surgical consultation on January 24, 2019 did not occur as a result of mistakes, not based on any deliberate effort to withhold treatment. Then, Wilson's transfer at the end of February 2019 from ECI to CMCF resulted in a new medical team at CMCF, led by Dr. Wilson, taking over Wilson's medical care. Inevitably, the new medical personnel had to learn about Wilson's

17

condition, understandably took some redundant steps, and effectively had to re-start the process of requesting surgical consultations. The various consultations—with a thoracic surgeon in May 2019, with a plastic surgeon in July 2019, and then the final surgery with the plastic surgeon in September 2019—occurred at intervals that are less than ideal, but not unusual and not indicative of deliberate indifference. Thus, although a one-year period before surgery could reflect deliberate indifference under certain circumstances, the specific history here shows that the cause of the delay was a combination of a change in contract medical providers and prison medical teams, as well as some unfortunate errors and possibly some negligence, but not deliberate indifference. Accordingly, the Court will grant summary judgment on Wilson's constitutional claims. The Court need not and does not address Defendants' remaining claims for relief.

## CONCLUSION

For the foregoing reasons, Defendants' Motions to Dismiss or, in the Alternative, Motions for Summary Judgment are granted. The Complaint is dismissed as to Defendant Sgt. Jackson. A separate Order shall issue.

Date: February 10, 2020

THEODORE D. CHUANG
United States District Judge